The next case on today's docket will be a case of people in the state of Illinois v. Diamond Barnes. We have a area with strangled, a car in the front, a chair in the back of the cab, and a man in the back seat. And you can take a few moments for the courtroom to be cleared, and then you may proceed. Up on your good. Up on your good. Whenever you're prepared. Up on your good. May it please the court. Yes. My name is Erin Griebel. I represent the appellant, Diamond Barnes, in this matter. Your Honor, Diamond Barnes proceeded pro se in a trial for first-degree murder in Madison County. He consistently claimed self-defense in the shooting of Marcus Shannon in the Shannon home in May of 2009. I'm sure that you're aware of the facts. One of the first issues that we would like to raise on behalf of Mr. Barnes, who, of course, did not succeed as he's not an attorney in preserving very many things for your review, would be the issue of his prison guard and the shackles that he wore as he made, I think, a rather admirable attempt in many ways to defend himself on various very serious charges. What we have in the record is perhaps a passing reference by the trial court judge. When Mr. Barnes is testifying on his own behalf, the trial court says to him that he may reach forward in front of him for a laser pointer because, quote, your left hand is free. I know from my own experience that in Madison County it's typical to have not only the heat shackles for prisoners but also to have the belts around the waist. And fed through that are two, is a chain that goes to both wrists. To my mind, that's an obvious reference to that apparatus for his hand being free. The other thing that the record may lack, but it's not fatal to disclaim, Your Honors, is any finding with regard to the booze factors as to why the defendant would be shackled in this manner. Particularly when he's defending himself and he is, at that point, his only resource. The general factors in Illinois is that what a trial court should consider is the seriousness of the charge, the temperament and the attributes of the defendant, his age, his past record, any past escapes or plans for a future escape, threats that he may have made against the court or the audience, and potential for mob violence. Here we have a first time offender. He had most recently been serving in the United States Navy. He was young, but not so very young. Whether that's good or bad, it's hard to say. He made no threats. He had not tried to escape. And in fact, when we look at what seems to be really the most important of these factors, which would be the seriousness of the charge, yes, it is first degree murder. But we have a defendant who is claiming justified use of force. This is a person who is claiming that even though this is an extraordinary and a tragic event, that he claims to have been acting reasonably the entire time. This is not a person who sits silently or otherwise while he's accused of murdering someone in cold blood. There are no findings on the record. The case law in Illinois has stated several times that these findings are necessary and that actions appear showing on the record that it offends sense of justice. It also denigrates the presumption of innocence that someone who has tried for a felony offense would be shackled in this manner. And the boosting comes from a 1977 Illinois Supreme Court case where a prisoner was shackled during a competency hearing. It was before a jury, but it certainly wasn't trial in the merits. They found that there should have been a statement on the record of those reasons and that not only did it offend the judicial notions of fairness, but that it was also contrary to the American Bar Association standards published back in 1968. In another 1977 case, in Reese Daly, the Illinois Supreme Court passed on this issue again in the context of an adjudicatory hearing. In that case, the trial court had made passing references to the seriousness of the charge, also that he felt that the courtroom security was poor. This Daly court held that that was not sufficient, that those were not findings on the records that take into account all of the concerns, both weighing against the defendant and also weighing in terms of the public interest. And the court stated, and I would note also, Your Honors, that this was not before a jury. The court stated that prison attire and unnecessary physical restraints are offensive even when there is no jury. So that is not one of the factors that can outweigh all of the others. And here we have a bench trial, so I'm sure you're aware. And that's why we point you again to In Rees Daly and that issue and note that there's a multitude of factors, and we don't even have a review of that. There are no findings to that effect on the record. Our position is that the court can certainly review for plain error. The First District did so in 1996 in the Bennett case. It was a trial for armed robbery. Again, in that record, the court noted that it can only seem to be determined for certain that the second day of trial, there were shackles present on the defendant, and in its findings and reversing for that error, the court certainly found that that was enough. So our position to you is that even if that were the only time, although we maintain it wasn't, that the defendant was shackled as he tried to conduct his own defense, that it was too much, that there was no clear showing on the record. There's no showing at all that he needed to be restrained in that manner. Is there a clear showing that he was shackled? There's the reference that I mentioned earlier, Your Honor, where the trial court says, you may reach there, your left hand is free. And that is the reference that we have on the record. And our position is that it's similar and sufficient in the same way it was in the Bennett case in 1996 in the First District. So we ask you to review that for plain error, Your Honors. Mr. Barnes' second claim of error is that the state failed to prove beyond a reasonable doubt that he did not act in self-defense. I think that one of the facts that was perhaps most overlooked in the state's brief was the fact that though many of the actors in this situation were on the front porch of the Shannon home, there was a very important person still on the side, and that was Hattie Manteloff, the defendant's grandmother. And so when we look at Diamond Barnes' actions and the various accounts that come through the testimony, it would seem that there was an altercation on the porch, that that's established at least by one of the state's witnesses, Mr. Warren, and then also by the defendant's brother, Ralph Barnes, that when Mr. Shannon exited his vehicle, that he confronted Mr. Warren and then Ralph Barnes. Both Mr. Warren and Mr. Barnes claim that Marcus exited that vehicle with two guns, one in hand. Mr. Warren claims that he was in fear for his life. Ralph Barnes says that both guns were placed to his stomach and that there was a tussle. At that point, testimony diverges. There is also testimony from a neighbor across the street who claims that she was able to see this, though it was getting towards midnight that they would see him at this point. The claim is that Mr. Shannon had verbalized, and something to the effect of it doesn't have to be like this, there are children in the home, and then proceeded inside, at which point then he was shot by the defendant, Mr. Barnes. The trajectory of the bullet that was determined by the forensic examiner was that the trajectory was through the rear and downward, which does suggest that Mr. Barnes' account, that Marcus Shannon went in after he hid behind Mr. Barnes' relatives and then proceeded into the home, perhaps did hide behind that chair. But what we also know, amazingly, is that anyone else, even Ms. Griffey, who claims to have seen the whole thing from peeking behind a door near the stairwell, none of those people in Mr. Shannon's family claimed to have seen him with a gun at any time. But there were two guns recovered from the home, a revolver and a semi-automatic pistol. Neither of those weapons were perfect, but they were functional. From the first floor, Your Honor. I don't have more detail than that, unfortunately. I was thinking of that myself. But what we have is Mr. Barnes' testimony that at that time, still in fear for his family and for himself, that Marcus Shannon proceeded into the home to load or reload those weapons. It wasn't clear. And that seems to be a pretty logical inference from his point of view. And so what we have, though, is this burden at trial. And it seems that, in terms of the elements of self-defense, that Mr. Barnes certainly did a good job at proving those elements or presenting at least some evidence, which is the requirement for the state to prove beyond a reasonable doubt that that mitigating factor did not exist. Our position is that the trial court didn't hold them to that, that the trial court based his decision as fact-finder upon the reasonableness of Mr. Barnes' beliefs. He said to him that firing a pistol into the deceased in his living room while he's kneeling or laying on the floor is the critical fact on that point. Sure, we don't really disagree that that's a critical fact. But the question is, what was he doing? And what was Mr. Barnes' belief at that time? His belief was that he was simply going to be meted by gunfire. And this was after, according to him and from his point of view, two members of his family had been physically assaulted by this person. Then we have the trial court. His other comment in rendering his decision was to Mr. Barnes that, at that point, you had the ability to retreat. It doesn't seem to be a lot of evidence on that point, the ability to retreat. Certainly, Mr. Shannon has entered his house. The testimony of Mr. Barnes is on the courts or near the threshold, one of the two. There's no duty in the law to retreat, however, Your Honors, and so the trial court's basing its finding of facts on those facts seems to be misplaced because what really ought to have happened was that a finding that Mr. Barnes had established some evidence on the elements of self-defense, which is that force was threatened against his person, that he was not the aggressor, there was a danger of imminent harm, that force threatened was unlawful, and that he believes, subjectively believes, that the danger exists, the use of force is necessary to avert the danger, the kind and the amount of force is necessary, and that those beliefs are reasonable. It would seem that the trial court's finding that Mr. Barnes scaled on the very last of those factors then obscured the rest of them, and we believe that's where the error lies. We also note that where a defendant successfully presents some evidence on those factors, that the burden then shifts to the state to prove that beyond reasonable doubt that he did not act in self-defense, and we know, again, a rule, that the guilt of the defendant must be so thoroughly established as to exclude any reasonable hypothesis of the defendant's innocence. So, the reasonable hypothesis, I think that when we look at the testimony of perhaps the one person who at least claims to have observed the shooting, that's Denise Griffey, we have her saying that Mr. Barnes proceeded forward and shot the victim in the back. But what's amazing about that testimony is that it conflicts with another state's witness who saw Marcus with two guns and saw him as the initial oppressor, conflicts with the statements of, just disregarding the defendant's statements, but also Ralph Barnes also testified that he felt threatened and in imminent danger of deadly force, and then we know weapons are recovered on the first floor, but there's no explanation offered as to why those weren't seen by this witness who claims to have seen everything. And, Your Honors, we ask also in the alternative that if you feel that the trial court did not err on that point, that what we're left with, really, is an unreasonable belief in self-defense. There is evidence in the records to support every single one of the factors of self-defense. If the trial court was correct, and the mistake really was the unreasonableness of that belief, then what we have is a second-degree murder case. And that is what the conviction would be, and so we ask you to consider that in the justifiable use of force here, as I just explained. And I would like to draw the Court's attention to the Sloan case that the State relies on. I feel it's distinguishable. In that case, the similar moving parts would be that the defendant entered the house, he was unwelcome, he did so with a sawed-off shotgun under his arm. He claims that he was there to see his child, though it was after the hour of 2 a.m. But the Sloan case differs markedly from this one. The boyfriend of his child's mother, he had reason to suspect, would be in the home. They had a previous altercation, and the defendant in the Sloan case had been threatened by the victim, saying that, you know, I will kill you one day. So when he entered that home at 2 a.m., it sort of stretches to the reality that he really could have been there for a visit of his small child. The victim was shot. The defendant claims that he was not the initial aggressor. And this is another key fact. He claimed to not be the initial aggressor because when he entered the bedroom where the victim was sitting while the woman and child were hiding in another bedroom, that it was dark, that only the TV lit the bedroom, and that he feared that the victim had a gun. And the court, of course, said that that didn't pass muster. Our position would be the facts are quite different. Diamond Barnes isn't claiming that the victim maybe had a gun. He's saying he did. That he had two. That he threatened two members of his family. And two people have testified to that. So the facts are different. And again, Diamond Barnes did not arrive at the house and was let inside in the middle of the night where people refused to answer his knock. He was let in the house by his grandmother. He was essentially invited. Certainly she's not the homeowner. But there was an invitation there that was accepted. And for those reasons, we believe that it's distinguishable and that there's more than enough evidence in the record to consider, at the least, an unreasonable belief in self-defense. And our final issue, Your Honors, I will spend just a brief amount of time on, which is the 15-20-25 Delight Sentencing Enhancement provision for commission of a violent felony with the use of a firearm. The Fourth District has not passed on this issue. The Illinois Supreme Court has, but our position is that we're in a slightly different stance. The 2006 case that's most recent on that is the Sharp case. The statute is one where the Illinois legislature decided that if someone had committed a violent felony, that they should face a sentencing enhancement of 15, 20, or 25 years to life for using a firearm. And that might be, as in subsection I, that they were simply armed with a firearm or two, that they wielded, or subsection III, that they discharged it and caused substantial bodily harm or death. So this statute is a sentencing enhancement that has been repeated throughout the Code, whether it's repeated throughout the Code and applied to various violent felonies. That's all fine. There's no problem with that. The problem, though, comes when it is attached to the first-degree murder sentencing statute, because, of course, first-degree murder results in death already. And so that's where we have an element of the enhancement and then an element that's inherent in the crime itself that takes a person from a 20-year enhancement for using a firearm in the commission of first-degree murder, an extra 20 years, to then a 25-year enhancement because of using a firearm in the commission of murder in the first degree and then causing death. But certainly the person is dead in the first instance. So our position is slightly different and distinguishable from SHARP in that that five years in particular would be unconstitutional and a double enhancement and not addressed by the Illinois Supreme Court and not addressed by this district and is right for your review. And we ask, if nothing else, to consider that the five years is duplicative on its face because the statute itself applies to a murder victim, someone who's been the victim of a murder and is already dead. Thank you. If there are no questions, I'll call the court. No, thank you, Ms. Brady. If there's nothing else, I'll call the court. Thank you. Ms. Shanahan. May I please the court? Yes. Counsel, my name is Sharon Shanahan and I represent the people of the state of Illinois. Thank you for your time. Dealing with the first issue in this case of shackling, as noted in the state's brief, the transcripts in this case begin with the trial. We have no idea what was discussed in pre-trial hearings. It is entirely possible that the question of shackling came up there, was discussed, certainly a reasonable solution to that case could have been you're not shackled while you're sitting down there at the table, but when you're going to be sitting here three feet away from the judge and the court reporter, you'll be shackled in. Don't know. It's the defendant's duty to present a complete record on appeal. There is no record to support any claim one way or another about to say that the trial court erred in not doing something when we don't know whether we did it or not, I think is a stretch. Counsel for the defendant says that she knows, she's been in these courts and she knows that they are shackled with the feet, waist and hands. Well, that's not in the record. That's not anything. That's just her testifying before this court. Counsel always also makes much about the fact that the defendant was pro se. That was his choice. He chose to defend himself. He's held to the same standard as anyone else. He's expected to make a record. He's expected to present a complete record on appeal. And so therein lies the first problem with defendant's shackling argument. I would note that recently our Supreme Court in Henry Jonathan C. Beese, the only reference to shackling in that record was when the trial court ordered the juvenile shackles removed when he testified and the Illinois Supreme Court held that the record did not show any error because there was no indication of when the juvenile was shackled or whether the judge was aware of it before the minor took the stand. And here the record does not show when, how, even if the defendant was shackled, nor does it show any order for it under Jonathan C. Beese. I think that you can definitely say that. Even the brief statement that the defendant relies upon in this case, it says your left hand's free. Without more than that, he can be holding his notes in his right hand. We simply don't know. And it is his duty to establish a record that supports his claim. In any case, this issue was not raised post-trial. It is reviewable only as plain error. And our Supreme Court has twice held, and H-Y-C-H-E Heitsch and Allen have both said that there has to be some kind of prejudice, absent prejudice. Plain error will not buy it for a shackling issue. This court has, in Tedrick, reviewed a shackling claim and said that given the overwhelming evidence of guilt, undisputed evidence that the defendant pursued the victim into his home, excuse me, that given the overlonging evidence of guilt, that there was no plain error. In this case, there is undisputed evidence that the defendant pursued the victim into his home and shot him in the back twice as he tried to hide behind a chair. As the appellate court said in People v. Clark, and I'm quoting, that the trial judge knew that the defendant was shackled without more is not enough to constitute reversible error. Moving on to self-defense, the most amazing thing I heard said today is that Patty Fatlock was in the house. And so, and this is in the brief too, so basically the defendant is thinking, oh my gosh, this dangerous victim is running into the house where my grandmother is and I need to protect her. And yet this same defendant, it is undisputed that this same defendant fired several shots into that house as he is leaving. He's not too concerned about his grandmother then. So to say that Patty Fatlock's presence in that house gave the defendant any reason to protect her when he's shown his total and blatant disregard by firing shots into the house. The other thing that's important to consider here is that the defendant seems to be forgetting the standard of review here, which is that you consider the life in the most favorable to the state. Consider the evidence in the life most favorable to the state. So we don't have to believe defendant's mother and defendant's brother and defendant's buddy that the victim came out of his car with two non-functioning guns threatening everyone. We don't have to believe that because they're just as entitled to believe the victim's wife, who said that he had nothing in his hands when he confronted the defendant on the porch. And that when the defendant pulled his pistol, the victim held up his empty hands and said, whoa, whoa, whoa. And that we can believe that Destiny Griffey, who says that she also heard Marcus Shannon say, whoa, whoa, whoa, whoa. And that she saw the defendant pursue the victim into the living room and then shoot him as the victim tried to hide behind a chair on his hands and knees with his face down. And we can believe Destiny Griffey when she says the victim had nothing in his hands as he ran into the living room and tried to hide. We can, I know that LaFawna McGowan didn't witness the shooting, but she heard the victim say, it doesn't have to be this way. There's some kids in the house indicating that the victim's not threatening him. Even Brad Warren did, you see Brad Warren is a friend of the defendant's, came with the defendant to the house. And he said, he's one of the ones that says, oh yeah, he had guns in his hand. We don't have to believe everything he said. He was a state witness. We don't have to believe everything he said. But he did say that Marcus Shannon said,  And that defendant then fired a shot and afterwards followed Marcus, the victim, into the house. So there's lots of evidence in the light most favorable to the state that says the victim was totally unarmed. The fact that two guns are found in his house later on, what does that prove? That he had two unworkable guns in his house. That's what it proves. And what did the unworkable aspect pertain to? The automatic was rusted. And the slide didn't work right. And it also wasn't loaded. And the revolver didn't revolve. And again, it was unloaded. So they're just there. They're just... And we don't know where they were found? No. First floor living room. I mean, certainly... The police report doesn't say they were found on a chair or in a drawer or anything along those lines? Your Honor, this brief was drafted by Mr. Sweeney before he left our office. So I don't have the record. I didn't read through every page of this record like I do in a brief that I write myself. So I can't answer that question. It certainly is not in any of the briefs and in Mr. Sweeney's extremely thorough statement of facts that provides this court norm to defendants. But in any case, how does... I mean, it wasn't behind a chair with him. I'll put it that way. And a homeowner choosing to have guns in his house doesn't make him an aggressor. So it's certainly, as I say, given the proper standard of review, which is considering the evidence in the light most favorable to the state, there is little doubt that the victim was unarmed. Certainly the defendant's witnesses all had a good reason to be biased, relatives of the defendant. And as far as this, there's one thing that I think is very important, is essentially, defendant says, the confrontation between Marcus and the defendant initially took place on the porch. The defendant has been uninvited. Well, Patty certainly may have initially invited him in. He was her grandson. But he was told to leave several times. The most he had done was to go from inside the house to the porch. He's not invited. He's been told to leave, and he has not done that. He's, in fact, refused to do that. So Marcus and his wife come back after learning that there's these people in there, uninvited people in their home. The confrontation on the porch takes place. The defendant has a gun. So far, there's no dispute about this. Marcus goes into the house. He says at trial and in his brief, he's got these really keen ears, and he can tell from his Navy training that the sounds he's hearing are of a gun being fired. A gun being loaded. And so he has to go from out on the porch to inside the house to shoot Marcus because, one, he has to defend this grandmother that he loves so much, but shoots into the house that she's living in. And, two, if he didn't do that, the victim, once he gets this gun loaded, could then shoot him out on the porch. Well, that directly conflicts with the statement the defendant made to the police after his arrest when they asked him, why did you go into the house yourself? He didn't say anything about hearing the sounds of a gun being reloaded. He followed an unarmed man into his house. I could probably just stop right there. He followed an unarmed man into his house, and he shot him. And he killed him as the man was hiding, cowering behind a chair, trying to avoid the armed man that had invaded his home. What's with the gun sentence right now? I'm sorry? Oh, the last issue? I believe that the Illinois Supreme Court's decision in Sharp is conclusive on that issue, and I would note that there are, as noted in the state's briefs, every health court that has considered this issue has found this to be not a constitutional invasion. Does that answer your question? I mean, as far as I know, the law is clear on this. I want to say really only one thing on the second-degree murder thing, and that is in addition to all the facts that I've put forth on this case that shows that it would not be a viable defense, the defendant filed a written waiver before trial of any right by the court to consider the charge. That's not, I remember a few years ago when the Illinois Supreme Court made a big distinction between forfeiture, waiver, and procedural default. And they said forfeiture is an intentional relinquishment or abandonment of a known right. If you forfeit something, if you intentionally relinquish or abandon something, that's it. This is not something that you can say, oh, my lawyer should have raised that issue. No, he intentionally forfeited any right to bring the very issue that he is trying to bring. If there are no other questions. Thank you. Ms. Shanley-Hammond, I'm afraid we'll be up about this time. Your Honors, Mr. Barnes is not held to the same standard as everyone else. He proceeded pro se. So certainly the trial court was not obligated to assist him in trying his case, but he is not held to the same standard as someone who is an attorney and a member of the bar and has practiced in this. And there's a certain amount of deference, and I think when you look through the, or review the record again, that you'll see that the trial court, I think in many instances, did try to extend to him some additional courtesies or limited instructions from time to time, but certainly couldn't do anything more than that. And so there is certainly precedent that a pro se defendant is granted a certain amount of leniency, and whether the appellate court stated explicitly, it certainly seems to be the case that that is taken into account at every level, because they simply are not practiced. And the finer procedural points in a waiver and a forfeiture and what are the difference between the two is certainly not something that a court of justice requires of a defendant who proceeds pro se. Your Honors, the counsel for the state noted that Mr. Barnes fired shots at the house. That's one way to look at it, perhaps. I think more specifically, Mr. Barnes stated that he did fire shots into the air. Of course, that's just on the face of that. It's something I'm personally responsible to do. But I think it also reflects the passion and the provocation that many people must have felt after an altercation of this nature. But I don't think that it reflects some sort of disregard for his grandmother, who was in the house, because these shots were fired into the air. Did those shots hit the house? Were shots fired in the air? Did they hit the house? It would seem that they did hit the house. They did hit the house. It seems that way from the ballistics evidence and what was recovered from the doorway that there was a bullet hole near the top of the door, Your Honor. It's not true, however, that bullets were found in this house on the first floor, and I regret that I cannot recall a more specific location. But the semi-automatic was rusted. That's true. The slide didn't work sometimes. But the firearms expert testified that it could be fired if it was manually loaded with a round in the chamber. Of course, that's true, because it wouldn't be necessary for the slide to work for that, and that the slide did work some of the time. But one of the effects on that, on the weapon, is that the chamber would have to be manually rotated, a rather simple action, if you're already able to fire a revolver. And I think, Your Honor, that those conclude my points, and I appreciate the court's time. Thank you. Thank you both for your briefs and arguments. We'll take your order under advisory.